# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION-BALTIMORE)

| | |
|---|---|
| JOHN O'NEIL JOHNSON TOYOTA, LLC,<br>2900 Hwy. 39 North<br>Meridian, MS 39301,<br>on Behalf of Itself and All Others<br>Similarly Situated,<br><br>     Plaintiff,<br><br>VS.<br><br><br>GRAY TELEVISION, INC.<br>4370 Peachtree Road, NE<br>Suite 400<br>Atlanta, GA 30319;<br><br>HEARST COMMUNICATIONS<br>300 W. 57th Street<br>New York, NY 10019;<br><br><br>NEXSTAR MEDIA GROUP, INC.<br>545 E. John Carpenter Freeway<br>Suite 700<br>Irving, TX 75062;<br><br>TEGNA INC.<br>7950 Jones Branch Drive<br>McLean, VA 22107-0150;<br><br>TRIBUNE MEDIA COMPANY<br>515 North State Street<br>Chicago, IL 60654;<br><br>SINCLAIR BROADCAST GROUP,<br>INC.<br>10706 Beaver Dam Road<br>Hunt Valley, MD 21030;<br><br> and DOES 1-20,<br><br>     Defendants. | Civil Case No.<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"), individually and on behalf of all others similarly situated ("the Class"), brings this class action complaint against Defendants Gray Television, Inc., Hearst Communications, Nexstar Media Group, Inc., Tegna Inc., Tribune Media Company, and Sinclair Broadcast Group, Inc., (collectively, "Defendants") for damages and injunctive relief pursuant to Section 1 of the Sherman Act, 15 U.S.C. §1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 as well as state antitrust, consumer protection and unjust enrichment laws.

## **INTRODUCTION**

1.      Defendants own and operate local television stations throughout the United States. Their television stations are affiliated with various networks, *e.g.,* ABC, CBS, FOX, NBC, and CW. As part of their business, Defendants sell air time for local television advertising. Defendants are horizontal competitors in the sale of air time for local television advertising.

2.      Plaintiff is an automobile dealership that purchases advertising air time from Defendants.

3.      Local television advertising remains a crucial source of revenue for Defendants. Defendants have, however, faced increased competition from companies offering online advertising platforms, such as Facebook and Google.

4.      On July 26, 2018, the *Wall Street Journal* reported that the United States Department of Justice's Antitrust Division ("DOJ") is investigating whether Defendants violated

the antitrust laws, resulting in higher local television advertising prices.[1] DOJ's probe is reportedly focused on communications and the exchange of proprietary, competitively sensitive information between Defendants' ad sales teams. DOJ discovered Defendants' conduct during its review of a proposed merger between Defendants Sinclair Broadcast Group Inc. and Tribune Media Company.[2] A Sinclair spokesman told the *Wall Street Journal,* "It is our understanding that this [DOJ investigation] is not specific to Sinclair, but focuses on the larger broadcast industry."[3]

5. Defendants' decision to collude on prices, instead of competing on rates of local television advertisements, was likely a response to combat the rapid shift in advertising dollars away from broadcast television commercials and toward various means of online and cable advertising from which they did not benefit. Defendants' desire to band together to stave off their market decline is further evinced by the rapid consolidation in ownership of the "independent" local television stations that offer local TV advertising.

6. As a result of their conduct, Defendants injured Plaintiff and Class members by artificially increasing prices for local television commercials. Through this action, Plaintiff seeks relief.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

---

[1] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales,* WALL STREET JOURNAL (July 26, 2018), https://www.wsj.com/articles/ justice-department-investigates-tv-station- owners-over-advertising-sales-1532633979 (last accessed August 20, 2018).
[2] *Id.* The proposed merger has since been called off.
[3] *Id.*

This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

8.      The Court has personal jurisdiction over Defendants subject to service under Section 12 of the Clayton Act, 15 U.S.C. §22. Defendants' collusive acts took place, in substantial part, in Maryland specifically and in the United States generally. These acts were conducted by persons and entities subject to the laws of the United States, including Maryland, as well as other states and territories.

9.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d). One or more Defendant resides, transacts business, is found, or has agents in this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

10.      Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## PARTIES

11.      Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson purchased advertising time directly and indirectly from one or more Defendants, during the Class Period.

12.      Defendant Gray Television, Inc. ("Gray") is a television broadcast company headquartered in Atlanta, Georgia. Through itself and its controlled subsidiaries, Gray owns and operates approximately 100 local television stations in the United States and sells air time for

4

local television advertising.[4]

13.     Defendant Hearst Communications ("Hearst") is a multimedia conglomerate headquartered in New York, New York. Through itself and its controlled subsidiaries, Hearst owns and operates approximately 32 local television stations in the United States and sells air time for local television advertising.

14.     Defendant Nexstar Media Group, Inc. ("Nexstar") is headquartered in Irving, Texas. Nexstar owns and operates approximately 170 television stations in the United States and sells air time for local television advertising.

15.     Defendant Tegna Inc. ("Tegna") is headquartered near McLean, Virginia. Through itself and its controlled subsidiaries, Tegna owns and operates approximately 47 local television stations in the United States and sells air time for local television advertising.

16.     Defendant Tribune Media Company ("Tribune") is headquartered in Chicago, Illinois. Through itself and its controlled subsidiaries, Tribune owns and operates approximately 43 television stations in the United States and sells air time for local television advertising.

17.     Defendant Sinclair Broadcast Group., Inc. ("Sinclair") is headquartered in Hunt Valley, Maryland. It operates as a national television broadcast company. Through itself and its controlled subsidiaries, Sinclair owns and operates 191 local television stations in the United States and sells air time for local television advertising.

<u>**AGENTS AND CO-CONSPIRATORS**</u>

18.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the

---

[4] On June 23, 2018, Gray entered into a merger agreement with Raycom Media, Inc. If the $3.6 billion merger is approved, and prior to any divestitures of stations, Gray will own and/or operate 142 full-power television stations, serving approximately 24% of United States television households.

normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

19.     Each Defendant acted as the principal, agent, or partner for each other Defendant with respect to the acts, violations, and common course of collusive conduct alleged herein.

20.     Persons not named as Defendants may have committed acts in furtherance of the unlawful antitrust conspiracy alleged herein, such that they may be liable as co-conspirators.

## ADDITIONAL FACTUAL ALLEGATIONS.

**I.    LOCAL TELEVISION INDUSTRY AND ADVERTISING**

### A.  Mechanics of Local Television Advertising

21.     According to Nielsen Media Research ("Nielsen") estimates, TV of all types (broadcast, cable, and satellite) reaches approximately 93% of the over 325 million people in the United States.[5]

22.     With such an extensive broad reach into the homes of so many Americans, television advertising remains an attractive means of marketing for global, national, and local entities. In 2017, a total of over $70 billion was spent on television advertising in the United States.

23.     Typically, local television stations are affiliated with one of the five national parent networks: ABC, CBS, FOX, NBC, and CW. For example, WSBT in South Bend, Indiana is an affiliate of CBS and owned by Sinclair. This means that WSBT is required to carry CBS's produced and purchased national content, like shows, national news programing, and

---

[5] Nielsen estimates that there are televisions in 119.6 million households, containing 304.5 million people over the age of two; http://www.nielsen.com/us/en/insights/news/2017/nielsen-estimates-119-6-million-us-tv-homes-2017-2018-tv-season.html (last accessed August 20, 2018).

national advertisements. Each local affiliate also allocates time for local and regional programing and advertising. Examples of this are local news and regional sports broadcasts.



24.     Local markets are demarcated by Nielsen into approximately 220 designated market areas ("DMAs").

25.     During both national and local programing, a portion of commercial advertising is designated for local advertisements. Unlike advertisements for global brands, such as Coca Cola or Toyota, that are broadcast across all of a network's affiliate stations, local advertisements are typically for regional or local businesses. Unlike national advertisement, the ads are only broadcast to the local station's viewership.

26.     As summarized by the Federal Communications Commission:

A distinction exists between the national and the local television

advertising markets, based on the location of the consumers that the purchaser of the advertising time intends to reach. Some companies (local advertisers) serve a geographically limited, or local, market and therefore wish to purchase advertising that reaches only local consumers. In contrast, other companies (national advertisers) compete in much larger geographic markets, and consequently seek to reach consumers nationwide.[6]

27.     National advertisements are typically negotiated between the advertising entity, such as an advertising agency or company on the one hand, and the national network on the other.

28.     When a local TV station pays a network like ABC for the right to broadcast a program like *"Jimmy Kimmel Live,"* some of the advertising time is already sold by ABC. However, all network programing comes with local "avails" and these are retained and sold by the local affiliate. Most are very valuable and are often "bundled" to force the sale of less lucrative time. For example, the local CBS affiliate in Birmingham, Alabama demands a significant local total advertising buy to get avails during premium Southeastern Conference football broadcasts.

29.     Unlike national advertisements, local advertisement rates are typically negotiated directly with the owners of the local television stations, including Defendants, or their agents.

30.     Advertising rates are typically based on Gross Rating Points ("GRP"). GRP is calculated based on the percentage of the market an advertisement is predicted to reach multiplied by the number of times the advertisement runs a week. For example, an advertisement thought to reach 40% of a given market or platform and run five days a week

---

[6] FCC, Notice of Proposed Rule Making, Review of the Commission's Regulations Governing Broadcast Television Advertising (1995), https://transition.fcc.gov/Bureaus/Mass_Media/Notices/ fcc95226.html.

would have GRP of 200.

31.     For GRP calculation, an advertisement's reach is based on what the Nielsen ratings were during the same time the prior year.[7] Therefore, GRP rates, even for the same program, can vary by local market and demographic makeup.

32.     GRP is the total amount of points that a buyer will purchase. GRP is broken down to individual rating points. These rating points are assigned a dollar value by the Defendants that in a competitive market would be based on the time of day or type of programing.

33.     The cost to buy a rating point is referred to as Cost Per Point ("CPP") and it varies by time of day and nature of programing. The CPP during the day will be lower than the CPP in prime time. Prime time and sports typically have the highest CPP. Daytime usually has the lowest CPP. Unlike the publicly known, third-party Nielson ratings, CPPs are proprietary to each seller of advertising.

34.     Defendants then offer "rate cards" to prospective local advertising customers. Rate cards are based on GRPs for various programing.

35.     The customer then negotiates rates based on the figures provided in the rate card with the seller. A savvy customer will shop around and solicit rates from the various entities in the hope of finding lower prices to aid them in negotiations. Because rates vary by the popularity of the programing, overall prices for a given time of day in a DMA will not be uniform across various stations. Further, because the historic Nielsen ratings used to calculate GRP are publicly known and the number of times an advertisement will run per week varies from project to project,

---

[7] There are approximately 119 million television households in the United States and Nielsen provides estimates for viewership based on a panel of 40,300 self-selecting households that remotely report their daily viewing patterns. Sahil Patel, *WTF is a GRP?* (Nov. 17, 2016). https://digiday.com/marketing/what-is-a-grp-gross-ratings-point/ (last accessed Aug. 20, 2018).

the truly proprietary information in any station's or sales entity's pricing model is the CPP. If Defendants collusively shared this information, they could formulaically fix the price for local TV advertisements across markets.

**B. The Shift Away from Local Television Advertising to Online Platforms**

36.     Over the past decade, viewership has migrated from broadcast television to digital and online platforms. The chart below shows the closing gap between the average daily time spent watching television versus on the internet.[8]



37.     This steady decrease in time spent watching television is, in part, attributable to shifting age demographics. As the graph below shows, younger Americans spend less than half the amount of time watching television than elder Americans per week.

---

[8] Jeff Dunn, *TV is still media's biggest platform — but the internet is quickly gaining ground* (June 9, 2017), https ://www. businessinsider. com/tv-vs-internet-medi a-consumption-average-chart-2017-6 (last accessed Aug. 20, 2018)



Further, the median age of Americans watching shows broadcast on local television stations skews middle aged and older.



By The New York Times | Source: Nielsen

Both of these facts suggest that there is not likely to be a natural economic reversal of this trend or an ability to innovate a way out of it.

38.     Not surprisingly, as the time Americans spend watching television declines, so too does the amount of dollars spent on television advertising. The following chart illustrates the decline.

---

[9] Sapna Maheshwari and John Koblin, *Why Traditional TV Is in Trouble* (May 13, 2018), https://www.nytimes.com/2018/05/13/business/rnedia/television-advertising.html (last accessed Aug. 20, 2018).
[10] *Id.*

| US Total Media Ad Spending Share, by Media, 2014-2020 % of total | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| TV* | 39.1% | 37.7% | 36.8% | 35.8% | 34.8% | 33.7% | 32.9% |
| Digital | 28.3% | 32.6% | 35.8% | 38.4% | 40.8% | 43.1% | 44.9% |
| —Mobile | 10.9% | 17.3% | 22.7% | 26.2% | 28.8% | 31.0% | 32.9% |
| Print | 17.4% | 15.4% | 13.9% | 12.9% | 12.2% | 11.6% | 11.1% |
| —Newspapers** | 9.1% | 8.0% | 7.2% | 6.6% | 6.1% | 5.7% | 5.5% |
| —Magazines** | 8.3% | 7.4% | 6.8% | 6.4% | 6.1% | 5.8% | 5.6% |
| Radio*** | 8.4% | 7.8% | 7.4% | 7.0% | 6.7% | 6.4% | 6.1% |
| Out-of-home | 4.0% | 4.0% | 3.9% | 3.8% | 3.7% | 3.5% | 3.4% |
| Directories** | 2.8% | 2.5% | 2.2% | 2.0% | 1.9% | 1.7% | 1.6% |

Note: *excludes digital; **print only, excludes digital; ***excludes off-air radio & digital
Source: eMarketer, March 2016

205439                                                                 www.eMarketer.com

[11]

39.     As the above chart indicates, in 2014, television advertising represented 39.1% of total media buys in the United States, with digital holding 28.3% of the market. By 2016, digital advertising had surpassed television as the primary marketing platform in the United States, with $72.5 billion in advertising revenue versus $71.3 billion in television advertising.[12]

## II. DEFENDANTS CONSPIRE TO INCREASE LOCAL TELEVISION ADVERTISING PRICES CHARGED TO THEIR CUSTOMERS

40.     The prices of local television commercials are based on the rates charged and quoted to customers by the stations operating in their respective local markets. Defendants understood that they could halt the downward pressure on the prices of local television commercials by entering into agreements to fix rates and/or to not compete on rates across the numerous local television markets in which they operate.

41.     Absent an agreement to conspire regarding advertisement rates, Defendants could not unilaterally raise the prices above prevailing levels of profitably because they would lose

---

[11] *Digital Ad Spending to Surpass TV Next Year* (March 8, 2016), https://Avww.anarketer.com/Article/Digital-Ad-Spending-Surpass-TV-Next-Year/1013671 (last accessed Aug. 20, 2018).
[12] George Slefo, Desktop and Mobile Ad Revenue Surpasses TV for the First Time, http://adage.com/article/digital/digital-ad-revenue-surpasses-tv-desktop-iab/308808/ (April 26, 2017).

customers to competitors with lower, competitive advertisement rates.

42.     Defendants' collusion caused local television advertising to be sold at artificially high prices. Defendants' unlawful conduct deprives Plaintiff and Class members who purchase local television advertising of the benefits of a competitive marketplace, resulting in artificially high prices.

43.     The harm Plaintiff and the Class members have suffered is quantifiable. Average advertising costs are collected by Nielsen-owned SQAD and can be reported by quarter, time of day, and by market. The added costs that Plaintiff and the Class members incurred due to Defendants' anticompetitive conduct result in artificially high prices charged to purchasers of local television advertising. Thus, as a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy, Plaintiff and the Class were injured in their business and property, in violation of federal antitrust laws.

**A.  Local Television Advertising Markets Are Conducive to Collusion**

44.     Local television markets have characteristics that make them susceptible to collusion. These include (1) high market concentration; (2) high barriers to entry; and (3) declining demand.

**1.     Local Television Advertising Markets Are Concentrated**

45.     Agreements are less costly to reach, all else equal, when there are few participants in a market. The more participants, the more difficult is the task of reaching consensus and coordinating behavior, all else equal.[13] As the DOJ states:

> Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe'

---

[13] *See, e.g.,* Carlton, D. and Perloff, J., *Modern Industrial Organization,* Boston, MA: Pearson Addison Wesley, Chapter 5 (4th ed. 2005).

sellers who control only a small fraction of the market.[14]



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

46. The consolidation of local television station ownership concentrated the majority of the price-setting power for local advertisement in the hands of six market participants. The fewer members of a pricing conspiracy, the easier it is to fix prices and police participation. In a 12-year span, the number of local stations owned or operated by Defendants grew from 179 in 2004 to 443 in 2016.

47. The five major television networks have a total of 1,097 full-power affiliate stations domestically. Following the recently announced acquisition by Gray of Raycom Media, Inc., Defendants would control a majority of the market for viewers by reaching nearly 100% of United States homes with televisions. Combined, Sinclair and Tribune control 235 stations in 108 of the 220 DMAs, reaching 72% of domestic viewers.[15]

---

[14] U.S. Department of Justice, *"Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For"* (June 25, 2015), http://www.justice.goviatepublic/guidelines/ 211578.htm (last accessed Aug. 20, 2018).

[15] Alvin Chang, *Sinclair's takeover of local news, in one striking map* (April 6, 2081),

### 2.    High Barriers to Entry

48.    Supra-competitive prices should attract new participants into a market. The presence of barriers that delay or limit the entry of firms into a market tends to make that market relatively more conducive to the formation and maintenance of an agreement to collude.[16] A high cost to enter the market provides a barrier to entry that inhibits participation by new (and potentially disruptive) players in the market. Thus, high barriers to entry can facilitate collusion by protecting conspirators from competition.

49.    As discussed above, when a local TV station pays a network like ABC for the right to broadcast a program like *"Jimmy Kimmel Live,"* some of the advertising time in the program is already sold by ABC. The local station, therefore, does not sell all the advertising time in the program — just the portion, sometimes contractually reserved, not previously sold by ABC. This has an important implication regarding barriers to entry. The existence of advertising minutes split with broadcast networks contractually limits the supply of local advertising minutes. Suppose, for example, that local affiliates of two broadcast networks agree to raise prices in a given area. A non-collusive local affiliate of a third broadcast network cannot increase its supply of advertising minutes as it only receives a given number of minutes every half hour (generally four minutes) due to the contract with its broadcast network.

50.    One need only look at the price tag of recent proposed mergers in the industry to understand that the costs of entry into this market are prohibitive to all but a very select few.'[17] Any entity attempting to enter the local television market from scratch would have to invest significant capital in broadcasting equipment and infrastructure, employees and on-air talent, and programing made by third parties, among other necessary elements. They would then have to attempt to build and retain

---

https://www.vox.com/2018/4/6/17202824/sinclair-tribune-map (last accessed Aug. 20, 2018).

[16] *See, e.g.,* Carlton, D. and Perloff, J., *Modern Industrial Organization,* Boston, MA: Pearson Addison Wesley, Chapter 5 (4th ed., 2005).

[17] The above-mentioned proposed Gray/Raycom merger is priced at $3.6 billion and Sinclair's recently called-off acquisition of Tribune was set at $3.9 billion.

an audience in a market that already likely has several long-standing established market participants in order to become a viable target for advertisers.

51.     All television broadcasters must also obtain a license from the government and abide by certain regulations. The FCC issues such licenses and has the ability to restrict some content. Importantly, there has been no significant increase in the number of television licenses in the past 20 years. Finally, the FCC and DOJ also weigh in on any proposed acquisitions or mergers in the broadcast market, creating a possible impediment to growth.

### 3.     Declining Demand

52.     As shown above, TV advertising is facing declining demand as more and more advertisers shift to online platforms. At the same time, the number of TV stations has stayed relatively stable, meaning that amount of air time for local advertising has stayed the same. In a normal functioning market, a decrease in demand would normally lead to a decrease in prices as competitors sought to sell their available local advertising air time at decreased costs.

53.     In a period of declining demand, firms have a greater incentive to collude with each other to raise prices. In explaining the motive to conspire as a plus factor, an American Bar Association ("ABA") Section of Antitrust Law publication describes "a text book example of an industry susceptible to efforts to maintain supracompetitive prices"[18] as a market that "was concentrated in a few large sellers, demand . . . was declining, and suppliers had excess capacity and high fixed costs."[19] This fairly describes the local television advertising markets.

### B.     The DOJ Investigates Price-Fixing in Local Television Advertising Markets

54.     On May 8, 2017, Sinclair announced that it had agreed to acquire Tribune for $3.9 billion. The deal would have given Sinclair control of over 200 local television stations and extended its

---

[18] ABA Section of Antitrust Law (2010), *Proof of Conspiracy Under Federal Antitrust Laws* at 76 (quoting from *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)).
[19] ABA Section of Antitrust Law (2010), *Proof of Conspiracy Under Federal Antitrust Laws* at 75.

reach into 70% of United States homes.[20]

55.     According to a July 26, 2018 *Wall Street Journal* report, during the DOJ's review of the proposed merger, it discovered evidence that Sinclair, Tribune, and "other independent TV station owners coordinated efforts when their ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials [.]"[21]

### C.  Additional Plus Factors Support the Existence of a Conspiracy

56.     Additional circumstantial evidence, known as "plus factors," support the pleading of a plausible horizontal agreement by Defendants to increase the prices for local television advertisements. These plus factors include: (1) a common motive to conspire; (2) actions against their apparent economic self-interest; and (3) inter-firm communications or other opportunities to conspire.

### 1.  Common Motive to Conspire

57.     Defendants had a common motive to conspire. Each Defendant faced declining demand for air time for local television advertising. To fill their capacity, Defendants would have to cut prices. But by working together, Defendants could stabilize or even increase prices for local television advertising.

### 2.  Actions Against Apparent Economic Self-Interest

58.     Defendants took actions against their economic self-interest. According to the media reports about the DOJ investigation, Defendants' ad sales teams shared competitively sensitive information with each other. Absent an agreement, competitors would not share

---

[20] Dawn C. Chmielewski, *Justice Department Investigating Local TV Station Owners Over Ad Sales — Report* (July 26, 2018), https://deadline.com/2018/07/justice-department-investigating-local-tv-station-owners-ad-sales-report-1202434431/ (last accessed Aug. 20, 2018).

[21] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales,* WALL STREET JOURNAL (July 26, 2018) https://www.wsj.com/articles/justice-department-investigates-tv-station- owners-over-advertising-sales-1532633979 (last accessed August 20, 2018).

information like this, which could be used against it. With a collusive agreement in place, however, the sharing of competitively sensitive information, such as CPP and GRP, *i.e.,* a price grid, facilitates price-fixing.

59.     The ease with which a participant in a price-fixing agreement can observe prices, capacities, market shares, and quantities produced and sold influences the ability to maintain the agreement. As noted by Kovacic, et al.: "Communication is a central part of the operation of a cartel."[22] Kovacic, et al. conclude that communications among rivals constitutes a plus factor, as they discuss:

> Overall, information is a valuable commodity. For one seller to know information about a rival is to give that seller a competitive advantage. A competitor has no unilateral interest in disadvantaging itself relative to its rivals.

> Suppose one seller knows the customers who purchased from another seller in the past quarter and knows the price and quantity of each transaction with each customer during the past quarter. The receiver will argue that it wants to know these things in a competitive marketplace and that it cannot be expected to ignore such information when it comes to its attention. However, why would the sender convey such information? Sloppiness and incompetence in the management of critical business information are not legitimate reasons. The sender may argue that it did not convey the information, but rather that each buyer gave this information to the receiver. But how would a buyer gain by conveying information to a nonawardee about the terms offered by an awardee? In the absence of direct evidence that such conveyances were made, it is reasonable to assume that the sender transmitted the information to the receiver. But the sender would have no unilateral self-interest in doing so. Thus, the motivation must be explicit collusion, and there must be an expectation of reciprocation.

> With regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase

---

[22] William E. Kovacic, Robert C. Marshall, Leslie M. Marx and Halbert L. White, *Plus Factors and Agreement in Antitrust Law,* MICHIGAN L. REV., Vol. 110, No. 3 at 423 (Dec. 2011).

expected returns in any competitive bidding process. The conveyance of firm-specific production and sales information is important for monitoring compliance with many cartel agreements. For example, market share allocations require knowledge of exactly this kind of information, as well as the ability of cartel members to verify such information. Sometimes cartels will use trade associations, export associations, or outside consultants to convey this information among themselves.[23]

Exchanging competitively-sensitive information would be against Defendants' apparent economic self-interest, and circumstantial evidence of an antitrust conspiracy.

### 3. Interfirm Communications and Other Opportunities to Collude

60.     Defendants had ample opportunities to conspire at various industry organization and advocacy group meetings and through their use of the same sales representative companies.

#### a. Industry Organizations and Advocacy Groups

61.     Defendants had ample opportunities to trade proprietary advertising sales data at a variety of trade organizations.

62.     The Television Bureau of Advertising, Inc. ("TVB") is a "not-for-profit trade association representing America's $21 billion local broadcast television industry" whose "members include over 800 individual television stations, television broadcast groups, advertising sales reps, syndicators, international broadcasters, and associate members."[24]

63.     All six Defendants are members of the TVB.

64.     Among the benefits that come with TVB membership are access to the

---

[23] *See, e.g., id.,* at 423-24.
[24] https://www.tvb.org/AboutTVB.aspx (last accessed Aug. 20, 2018).

advertisement spending and revenue data of members via the TVB AE Dashboard, and TVB Road Shows. The TVB Road Shows are described as "a customized market event for local advertisers not currently using broadcast TV . . . hosted by TVB member stations."[25]

65.     As part of TVB, on November 20, 2017, Defendants announced the creation of the TV Interface Practices or "TIP" Initiative. TIP is "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."[26]

66.     After **TIP** was made public, three of the Defendants' CEOs made statements evincing their desire to work collaboratively. In the same press release, Perry Sook, Nexstar's President and CEO, stated that they all "must work together as an industry"; Sinclair's President and CEO, Chris Ripley, stated that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to boost advertising sales; and Tribune's President and CEO, Larry Wert, suggested that the TIP Initiative would allow Defendants to "actively work [] together."[27]

67.     The National Association of Broadcasters ("NAB") describes itself as "the voice for the nation's radio and television broadcasters" and that "[a]s the premier trade association for broadcasters, NAB advances the interests of our members in federal government, industry and

---

[25] https://www.tvb.org/Default.aspx?TabID=1519.

[26] *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions* (Nov. 20, 2017), https://www.businesswire.com/news/home/ 20171120005141/en/Local-Television-Broadcasters%E2% 80%99-TIP-TV-Interface-Practices (last accessed Aug. 20, 2018).

[27] *Id.*

public affairs; [and] improves the quality and profitability of broadcasting[.]"[28]

68.    All six Defendants are members of the NAB.

69.    Tegna's President and CEO, David Lougee, and Hearst's President, Jordan Wertlieb, both serve on NAB's Executive Committee.[29] Gray TV's Chairman, President, and CEO, Hilton Howell; Nexstar's Chairman, President and CEO, Perry Sook; Sinclair's President and CEO, Chris Ripley; and Tribune's COO, Kathy Clements, are members of NAB's Television Board of Directors.[30]

70.    The mission statement of the Media Rating Council ("MRC") is to "[s]ecure for the media industry and related users audience measurement that is valid, reliable, and effective" by "[s]etting Standards and [c]onducting audits performed by an independent CPA firm to verify compliance with our Standards[.]"[31]

71.    All six Defendants are members of the MRC.[32]

72.    MRC facilitates communication between horizontal competitors by listing that one of the benefits of membership is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars."[33]

73.    Each of these trade organizations not only gave Defendants ample opportunities to meet with one another; their explicit purpose was, in part, to share information or to increase profitability.

---

[28] https://www.nab.org/about/default.asp (last accessed August 20, 2018).
[29] https://www.nab.org/about/nabBoard.asp (last accessed August 20, 2018).
[30] *Id.*
[31] http://mediaratingcouncil.org/Mission%20Statement.httn (last accessed August 20, 2018).
[32] http://mediaratingcouncil.org/Member%20Companies.htm (last accessed August 20, 2018).

[33] http://mediaratingcouncil.org/Benefits.htm (last accessed August 20, 2018).

**b. Defendants Engaged the Same Sales Representative Entities to Sell Local Television Advertising**

74.     The Defendants regularly use outside sales agencies which keep rosters of local television stations and sell advertising nationwide while serving as a liaison between the stations and larger media buyers.

75.     For example, if an advertising agency wanted to place one of its client's ads on broadcast television across the Midwest, it could just contact a sales representative company that has a roster of stations across the region owned by different parent companies, instead of trying to negotiate rates with each individual station.

76.     The largest sales representative, which facilitated advertisement sales on behalf of several Defendants, Katz Media Group, boasts a roster of "more than 800+ stations across all major networks," has "an enormous geographic footprint that touches nearly every state across the country," [34] and "transact[s] business daily utilizing the latest programmatic platforms and automated technologies to monetize results for our clients[.]" [35]

77.     Katz claims to be "one-stop shopping to build a local presence."

78.     Another large sales representative, utilized by several Defendants, CoxReps, maintains a "roster of 400+ local television stations. . .covering more than 87% of all U.S. TV households." [37] Its mission is "to maximize revenue for client stations and provide value to agency partners." [36]

79.     Both Katz and CoxReps conduct advertising sales negotiations for local

---

[34] http://katztvgroup.com/ourdivisions/SitePages/localactivation.aspx (last accessed August 20, 2018).

[35] http://katztvgroup.com/ourdivisions/SitePages/adsalesoperations.aspx (last accessed August 20, 2018).

[36] *Id.*

advertising on a national level on behalf of the Defendants. The ability to serve as both a means for sharing proprietary pricing and sales data and an instrument to carry out the implementation of supra-competitive prices is readily apparent.

80.    These sales representative companies amount to a centralized database of all the Defendants' proprietary local pricing and sales data. They represent another element of the local television advertising market that makes the possibility of anticompetitive collusion more plausible.

## ANTITRUST INJURY

81.    As a result of Defendants' conduct, Plaintiff and the Class have suffered antitrust injury. Defendants are horizontal competitors who compete to sell air time for local television advertising. Plaintiff and the Class are their customers who buy local advertising air time. Defendants conspired to increase the price for local television advertising. Plaintiff and the Class directly and indirectly paid the supra-competitive price to Defendants. Plaintiff and the Class have suffered the quintessential antitrust injury—purchasing a price-fixed product from horizontal competitors.

## FRAUDULENT CONCEALMENT

82.    No reasonable amount of diligence by Plaintiff or the Class would have uncovered Defendants' scheme. Any statute of limitations is therefore tolled by Defendants' intentional concealment of their fixing of rates for local broadcast television advertising. Plaintiff and Class members were deceived regarding Defendants' collusion to fix and/or maintain artificially high prices for local television advertising and could not reasonably discover the Defendants' anticompetitive conduct.

83.    As alleged herein, Defendants' fixing of local broadcast television advertising

rates was material to Plaintiff and Class members at all relevant times. Plaintiff and Class members could not have discovered that Defendants were fixing rates for local broadcast television advertising because how each station or sales entity calculates local broadcast television advertising is not publicly disclosed. This made it possible for Defendants to conspire together to conceal the fact that they were not acting as competitors in this market.

84.     Plaintiff and the Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were fixing the prices of local broadcast television advertising. In fact, Defendants' conduct was only discovered because DOJ was able to review their internal documents as part of a merger review. Plaintiff and the Class have no such access to Defendants' documents.

85.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their fixing of the pricing of local broadcast television advertising. Plaintiff and Class members reasonably relied on Defendants' public and private statements indicating that they were offering competitive rates.

86.     All applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of itself and all members of the proposed Class, as defined below:

24

All persons or entities who purchased television advertising air time directly from Defendants, or any current or former subsidiary, affiliate, or agent of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until such time as the effects of Defendants' unlawful conduct cease. Excluded from the Class are Defendants; the officers, directors, agents, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to the trial.

88.     Plaintiff also brings this action on behalf of itself and as a class action under Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust,

unfair competition, unjust enrichment and consumer protection laws of the states whose laws are

set forth in the Second and Third Claims below.  The states whose laws are set forth in the Second

and Third Claims below, are collectively referred to as the "Indirect Purchaser States."  These

claims are brought by Plaintiff on behalf of itself and entities in the Indirect Purchaser States listed

in the Second, Third and Fourth Claims as follows (the "State Damages Class"):

All persons or entities, in the Indirect Purchaser States, who purchased television advertising air time indirectly from Defendants, or any current or former subsidiary, affiliate, or agent of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until such time as the effects of Defendants' unlawful conduct cease. Excluded from the Class are Defendants; the officers, directors, agents, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to the trial.

88.     The Class is readily ascertainable.

89. Plaintiff believes that there are thousands of geographically dispersed Class

members throughout the United States. The exact number and their identities should be

25

known by Defendants or capable of identification via third parties.

90.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the Class sustained damages arising out of Defendants' alleged herein. The damages of each member of the Class were directly caused by Defendants' illegal conduct.

91.     There are questions of law and fact common to the Class, including, but not limited to, the following:

     a.     whether Defendants and their co-conspirators and agents engaged in a conspiracy with each other to share confidential information regarding local television advertising rates;

     b.     whether Defendants' conspiracy impacted the price of local television advertising sold to the Class;

     c.     the length of the conspiracy;

     d.     whether Defendants intentionally concealed their scheme;

     e.     whether Defendants' conduct is a per se violation of Section 1 of the Sherman Act;

     f.     whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

     g.     whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

     h.     an appropriate class-wide measure of damages; and

     g.     the appropriate injunctive relief.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's issues are the same as, and not antagonistic to, all members of the Class,

and Plaintiff has retained competent counsel experienced in the prosecution of antitrust class actions.

93.     Questions of law or fact are common to all members of the Class and predominate over any individual issues of members of the Class.

94.     A class action is the superior means for the efficient adjudication of these allegations. The prosecution of a multitude of separate actions by individual members of the Class would impose massive burdens on the courts and Defendants and would create a risk of inconsistent adjudications of the law and facts common to the Class.

95.     A class action will achieve substantial economies of time, effort, and expense and will assure uniformity of decision as to all similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## FIRST CLAIM FOR RELIEF

### Violations of 1 of the Sherman Act, 15 U.S.C. 1
(Against All Defendants)

96.     Plaintiff repeats and incorporates by reference all of the foregoing allegations of this Complaint.

97.     From January 1, 2014, until such time as the effects of Defendants' unlawful conduct ceased, Defendants entered into and engaged in a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

27

98.     Defendants and their co-conspirators engaged in a conspiracy consisting of a continuing agreement, understanding, or concerted action in furtherance of which Defendants fixed, maintained, or made artificial prices related to television advertising air time as alleged herein.

99.     As horizontal competitors, Defendants' price-fixing conspiracy is a per se violation of the Sherman Act. It is therefore facially an unreasonable and unlawful restraint of trade that had anticompetitive effects, as alleged herein. In any event, there is no legitimate business justification for Defendants' restraint of trade. Any purported pro-competitive benefit was pre-textual or could have been achieved by less restrictive means.

100.     As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiff has suffered injury to its business or property. The injury to Plaintiff and members of the Class are of the type the antitrust laws were created to prevent and flow from Defendants' unlawful conduct.

101.     Defendants' conduct alleged herein substantially impacted the flow of interstate commerce because television advertising air time is purchased throughout the United States.

102.     Plaintiff requests the Court to enter judgment in its favor against Defendants, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such relief as the Court deems just.

## SECOND CLAIM FOR RELIEF

Violation of State Antitrust Statutes
(on behalf of Plaintiff and the State Damages Class)

130.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

131.    From as early as January 2014 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of television advertising air time in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

132.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for television advertising air time.

133.    In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including participating in conversations among themselves, in the United States, during which they exchanged information which resulted in their fixing, increasing, inflating, maintaining, or stabilizing effective prices paid by Plaintiff and members of the State Damages Class with respect to Television advertising air time sold in the United States.

134.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices of television advertising air time.

135.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

29

136.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

137.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

138.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

139.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

140.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

141.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

142.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of television advertising air time at supracompetitive levels.

143. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of television advertising air time.

144. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: Fixing, raising, stabilizing, and pegging the price of television advertising air time.

145. The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of television advertising air time has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for television advertising air time sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased television advertising air time sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

146. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property in that they paid more for television advertising air time than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff and members of the State Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

148.    Defendants' combination or conspiracy had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the State Damages Class, including those who resided in the District of Columbia and/or purchased television advertising air time in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the State Damages Class, including those who resided in the District of Columbia and/or purchased television advertising air time in the District of Columbia, paid supracompetitive, artificially inflated prices for television advertising air time, including in the District of Columbia.

149.    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

150.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

151.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

153.     Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

154.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

155.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

156.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.  Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

157.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

158.     Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

159. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

160. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

161. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

162. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

163. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

164. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

165. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

166. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

167. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

168. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

169. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

170. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

171. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

172. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

173.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Maine; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition: and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

174.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

175.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

176.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

177.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

178.    Defendants' combination and conspiracy had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

179.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

180.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

181.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

182.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

183.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

184.    During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

185.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

186.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

187.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

188.     Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the State Damages Class, including those who resided in Mississippi and/or purchased television advertising air time in Mississippi were deprived of free and open competition, including in Mississippi: and (4) Plaintiff and members of the State Damages Class, including those who resided in Mississippi and/or purchased television advertising air time in Mississippi paid supracompetitive, artificially inflated prices for television advertising air time, including in Mississippi.

189.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

190.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

191.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

192.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

193.     Defendants' combination and conspiracy had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

194.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

195.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

196.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

197.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

198.     Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the State Damages Class,

including those who resided in Nevada and/or purchased television advertising air time in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiff and members of the State Damages Class, including those who resided in Nevada and/or purchased television advertising air time in Nevada, paid supracompetitive, artificially inflated prices for television advertising air time, including in Nevada.

199. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

200. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

201. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

202. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

203. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

204.    During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

205.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

206.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

207.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

208.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

209.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

210.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

41

211.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

213.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout New York; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the State Damages Class, including those who resided in New York and/or purchased television advertising air time in New York, were deprived of free and open competition, including in New York; and (4) Plaintiff and members of the State Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for television advertising air time when they purchased television advertising air time, including in New York, or when they purchased, including in New York, Television advertising air time, that was otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase television advertising air time that they would have otherwise have purchased absent the illegal conduct.

214.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

215.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

216. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiff and members of the State Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

217. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

218. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the State Damages Class, including those who resided in North Carolina and/or purchased television advertising air time in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiff and members of the State Damages Class, including those who resided in North Carolina and/or purchased television advertising air time in North Carolina, paid supracompetitive, artificially inflated prices for television advertising air time including in North Carolina.

219. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

220. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and members

of the State Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

222.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

223.    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

224.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

225.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

227.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout

Oregon; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

228.    During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

229.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

230.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

232.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the State Damages Class, including those who resided in South Dakota and/or purchased television advertising air time in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiff and members of the State Damages Class, including those who resided in South

Dakota and/or purchased television advertising air time in South Dakota, paid supracompetitive, artificially inflated prices for television advertising air time including in South Dakota.

233. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

234. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

235. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

236. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

237. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the State Damages Class, including those who resided in Tennessee and/or purchased television advertising air time in Tennessee, were deprived of free and open competition including in Tennessee; and (4) Plaintiff and members of the State Damages Class, including those who resided in Tennessee, and/or purchased television advertising air time in Tennessee, paid supracompetitive, artificially inflated prices for television advertising air time including in Tennessee.

238. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

239. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

240. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

241. Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Utah; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

242. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

243. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

244. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiff and

47

members of the State Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

246.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

247.    During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

248.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

249.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiff are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiff and members of the State Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

251.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the State Damages Class, including those who resided in West Virginia and/or purchased television advertising air time in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiff and members of the State Damages Class, including those who resided in West Virginia and/or purchased television advertising air time in West Virginia, paid supracompetitive, artificially inflated prices for television advertising air time including in West Virginia.

252.    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

253.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

254.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

256.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

257.    During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

258.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

259.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiff and members of the State Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

260.    Plaintiff and members of the State Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and members of the State Damages Class have paid more for television advertising air time than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

261.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiff and the members of the State Damages Class.

262.    Accordingly, Plaintiff and the members of the State Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## **THIRD CLAIM FOR RELIEF**

Violation of State Consumer Protection Statutes
(All Claims on behalf of Plaintiff and the State Damages Class)

263.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

265.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

266.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which television advertising air time were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the State Damages Class.

267.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a) (10).

268.     Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and the members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

269.     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

270.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the State Damages Class have been injured in their business and property and are threatened with further injury.

271.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a) (10) and, accordingly, Plaintiff and the members of the State Damages Class seek all relief available under that statute.

272.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

273.     During the Class Period, Defendants marketed, sold, or distributed television advertising air time in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

274. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

275. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

a. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) The violations of Section 1 of the Sherman Act, as set forth above; (2) The violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

b. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

c. Defendants' acts or practices are unfair to purchasers of television advertising air time in the State of California within the meaning of Section 17200, California Business and Professions Code; and

d. Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout California; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiff and members of the State Damages Class, including those who resided in California and/ or purchased television advertising air time in California, were deprived of free and open competition, including in California; and (4) Plaintiff and members of the State Damages Class, including those who resided in California and/or purchased television advertising air time in California, paid supracompetitive, artificially inflated prices for television advertising air time, including in California.

276.    Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

277.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

278.    The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the State Damages Class to pay supracompetitive and artificially-inflated prices for television advertising air time. Plaintiff and the members of the State Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

279.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the State Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

280.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

281.    Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout Florida; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout Florida; (3) Plaintiff and members of the State Damages Class were deprived of free and open competition; (4) Plaintiff and members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time; and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for their television advertising air time.

282.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

283.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Damages Class have been injured in their business and property and are threatened with further injury.

284.    Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiff and members of the State Damages Class seek all relief available under that statute.

285.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

286.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which television advertising air time were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the State Damages Class.

287. Plaintiff were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for television advertising air time. Defendants had the power to set that price. Moreover, Plaintiff lacked any meaningful choice in purchasing television advertising air time because they were unaware of the unlawful overcharge and because they had to purchase television advertising air time. Defendants' conduct with regard to sales of television advertising air time, including their illegal conspiracy to secretly fix the price of television advertising air time at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff.

288. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiff and the members of the State Damages Class and the prices paid by them for television advertising air time as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiff and Class members for television advertising air time.

289. Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and the members of the State Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the State Damages Class paid supracompetitive, artificially inflated prices for television advertising air time.

290.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

291.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the State Damages Class have been injured in their business and property and are threatened with further injury.

292.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.,* and, accordingly, Plaintiff and the members of the State Damages Class seek all relief available under that statute.

293.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

294.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which television advertising air time were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the State Damages Class.

295.    Defendants deceptively led purchasers, such as Plaintiff and Class members, to believe that the television advertising air time they had purchased had been sold at legal competitive prices, when it had in fact been sold at collusively obtained inflated prices, that were passed on to them.

296.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public

interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

297. Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased television advertising air time were misled to believe that they were paying a fair price for television advertising air time or the price increases for television advertising air time were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

298. Defendants' unlawful conduct had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout New York; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the State Damages Class, who resided in and/or made purchases of television advertising air time in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiff and members of the State Damages Class, who resided in and/or made purchases of television advertising air time in New York, paid supracompetitive, artificially inflated prices for television advertising air time, and were subjected to Defendants' deceptive practices.

299. Defendants knew that their unlawful trade practices with respect to pricing television advertising air time would have an impact on all purchasers in New York and not just the Defendants' direct customers.

300. Defendants knew that their unlawful trade practices with respect to pricing television advertising air time would have a broad impact, causing class members who indirectly

purchased television advertising air time to be injured by paying more for television advertising air time than they would have paid in the absence of Defendants' unlawful trade acts and practices.

301.    During the Class Period, Defendants marketed, sold, or distributed television advertising air time in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

302.    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed television advertising air time in New York.

303.    Plaintiff and members of the State Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

304.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

305.    Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which television advertising air time were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the State Damages Class.

306.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of television advertising air time, and broad adverse impact on the public at large, and

harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

307.    Defendants' unlawful conduct had the following effects upon purchasers of television advertising air time in North Carolina: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the State Damages Class, including those who resided in North Carolina and/or purchased television advertising air time in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiff and members of the State Damages Class, including those who resided in North Carolina and/or purchased television advertising air time in North Carolina, paid supracompetitive, artificially inflated prices for television advertising air time, including in North Carolina.

308.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of television advertising air time.

309.    Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.

310.    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed television advertising air time in North Carolina.

311.    Plaintiff and members of the State Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiff and members of the State Damages Class seek all relief available under that statute.

312.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

      a.    Defendants' combinations or conspiracies had the following effects: (1) Television advertising air time price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Television advertising air time prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for television advertising air time.

      b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured and its business and property and is threatened with further injury.

      d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiff seeks all relief available under that statute.

## FOURTH CLAIM FOR RELIEF

Unjust Enrichment
(on behalf of Plaintiff and the State Damages Class)

313.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

314.    Plaintiff brings this claim under the laws of all states listed in the Second and Third Claims.

315.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of television advertising air time.

316.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the members of the State Damages Class for television advertising air time.

317.    Plaintiff and the members of the State Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the State Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the State Damages Class may make claims on a pro rata basis.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.      That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the law;

C.      That the Court award Plaintiff and Class members damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.      That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      That the Court award Plaintiff pre- and post-judgment interest;

F.      That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

G.      That the Court award any and all such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: September 19, 2018

/s/ *Paul Mark Sandler*
Paul Mark Sandler (Bar No. 00145)
Eric R. Harlan (Bar No. 23492)
Shapiro Sher Guinot & Sandler
250 West Pratt Street
Suite 2000
Baltimore, Maryland 21201
Phone: (410) 385-0202
Fax: (410) 539-7611
pms@shapirosher.com
erh@shapirosher.com


Jonathan W. Cuneo (*pro hac vice forthcoming*)
Victoria Romanenko
**CUNEO GILBERT & LaDUCA, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
vicky@cuneolaw.com

Don Barrett (*pro hac vice forthcoming*)
Katherine Barrett Riley (*pro hac vice
    forthcoming*)
Sarah Starns (*pro hac vice forthcoming*)
David McMullan (*pro hac vice forthcoming*)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
KBRiley@BarrettLawGroup.com
sstarns@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter (*pro hac vice forthcoming*)
**LARSON • KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Attorneys *for Plaintiff John O'Neil Johnson Toyota, LLC*